Good morning, your honors, and may it please the court. Michael Weinstein from the Federal Public Defender, appearing on behalf of the petitioner, Ronnie Conrad. I'd like to reserve four minutes for a rebuttal, and I'll mind the clock. Your honors, Ronnie Conrad is serving a life sentence right now, and as much as the respondent has tried to make this case about Conrad and the crimes he was convicted of, this case is really about his lawyer and the multiple ways he was conflicted at the time of trial. Astonishingly, at the same time that trial counsel was representing Conrad, he was representing the alleged victim in this case, Garcia. But Garcia wasn't just an alleged victim. She was simultaneously implicated in four of the seven charges that were facing Conrad. So she could have just as easily had been a co-defendant in this case. But instead of being a co-defendant, she became the state's main witness. That's just the tip of the iceberg. At the time of felony charges of his own. Counsel, we understand the facts. If you can tell this panel, what facts or what factors you believe established that there was an actual conflict, an actual conflict in this case, and what cases supporting that position? Sure. The California, I think this gets to sort of the heart of the California Court of Appeals decision about whether their interests were aligned or not. Right. The, I think what the state court did is that they confused goals with interests. There's evidence in the record that Conrad and Garcia had a similar goal. They both wanted to see Conrad get acquitted of the charges that were facing him. But their interests were very, very different, and they were at odds with each other. And the interests I would direct the court's attention to are their liberty interests. And this is most clear with respect to the four felony charges involving the drugs and the guns. And this is why. On the one hand, Conrad needed Garcia to come to court and testify and take ownership of the guns and the drugs. Because someone was going to go to prison for those. The guns and the drugs were found in a shared motel room that Garcia and Conrad were both found in. So he, his liberty interests depended on Garcia taking ownership of them. That would have been powerful evidence that would have led, could have led to an acquittal on those charges. You know, I'm struggling with that a little bit. I'm a trial judge, so I see a lot of trials like you do. Here's what I understand from the record. Ms. Garcia changed her story. And when she was doing her preliminary, under oath, preliminary testimony, made all the statements you just asked for. It's all mine. It's all my fault. You know, words to the effect that, you know, the defendant wasn't responsible for the drugs or the guns. That was read to the jury. Okay? That transcript was read to the jury. So they heard exactly what you're asking for. They heard her say that. Now, she wasn't live in court. I'm not sure that makes a difference. I'd like to hear about that. But had she been live in court, I think she had the real risk of being subject to a potentially devastating cross examination because those jail records, the jail phone calls, the records of the calls where the defendant was asking Ms. Garcia to lie for him. And she was going along with it. So, and on top of all that, I think it bears note that the trial judge said Ms. Garcia was a shaky witness. She did not present well. So, I'm just having a really hard time saying, seeing how he, this was in any way, shape, or form, not in Conrad's interest to actually not have her there. That he benefited from that. He got the whole story from her without any of the downsides. That's where I would actually, I disagree with the court about that point. Because if you read her preliminary hearing transcript, it wasn't helpful to the defense at all. Yes, she made some of these statements that were exculpatory. But then, if you look at the rest of the direct examination testimony, everything fell apart after that point. And the cross examination that was made by a different lawyer was completely ineffective. We don't know if there was any prep for Garcia heading into that. Whether, what we do know is that trial counsel that came in after the preliminary hearing never interviewed her about the crimes. So, we actually don't know if a, if she had testified at trial, whether her testimony would have been more believable. Whether they could have shored up any of the weaknesses that had been, that had surfaced during the preliminary hearing. What about one of the comments that Judge Donato mentioned? Which is, what about the benefit of live testimony versus reading a transcript? I mean, I certainly have been in trials where it's one of those trials where they're reading testimony or reading depositions and you know, I want to put something in my ears after a few minutes. I mean, what do you do in a circumstance like that where you have the option, if you're a defense attorney, are you going to want something read or are you going to want a live witness saying X, Y, and Z? Yeah, no, Judge Sanchez, I think you're hitting it on the head. Is that... It's Mendoza. Oh, Mendoza, sorry, sorry. Mendoza, you hit it on the head that the jury needed to be able to assess her demeanor, her body language, her tone of voice. The other thing to keep in mind too that's not laid out very clearly in the briefs is that heading into trial, the deck was stacked against Conrad to begin with because the prosecution was going to have witnesses that were going to testify to some of the statements that Garcia had made and impeach her. So, on the defense side, you really had nothing else to present except for Garcia's testimony. Judge Donato, you had mentioned that maybe she could have been a worse witness, maybe it would have been bad for the defense. I actually don't think that it could have gone any worse for the defense. There was only upside to presenting her and there was especially upside if trial counsel had adequately prepped her or examined her or interviewed her. And then on top of that, you could have... I mean, well, I guess my struggle with all this is we're reviewing the state court's decision under AEDPA and so we have to decide whether the state court was unreasonable in its application of clearly established law. And I'm hearing two very plausible alternative ways of viewing what might have happened had she testified. I think you present good points but so does Judge Donato. And why does that make with the state court's determination that her interests were aligned with him? Because I guess one view of this is Conrad did not want her to... or Conrad's counsel did not want her to testify because she would have been a terrible witness and it might have reinforced the view that he was guilty. And she didn't stand to gain by testifying because she could be subject to criminal liability and while you may disagree with that, why is that unreasonable? It's unreasonable because the state court concluded that their interests were aligned. There was no equivocation. There was no... But I just mentioned a version in which their interests would be aligned, which we are allowed to, in fact, guide it to read into something when there's not that much analysis by the state court. That's just what the president tells us to do. No, no, I understand that. And this gets back to the point that I was trying to make earlier, which has to do with how their liberty interests were directly at odds with each other. I think the record shows that Conrad needed her for the reasons I had mentioned, that the deck was stacked against him. If she didn't come to court and admit and take ownership over the guns and drugs, he was going down for those charges no matter what. His liberty interest was at stake. On the other hand, you have Garcia and as you mentioned, if she came to court and she testified and she took ownership of the drugs and the guns, she's just admitted to multiple felonies. So her liberty interests are in jeopardy. That is not in alignment. Their liberty interests are directly at odds with each other. Well, but a trial lawyer makes a call about who to present a witness at trial based on all these factors we've talked about this morning. Isn't it equally plausible that the lawyer could have said, I don't want to call Ms. Garcia because she's just a time bomb who's going to hurt me more? To me, that seems like a perfectly legitimate, non-conflict of interest judgment call by a trial lawyer. And I don't see how you can, maybe it is possible it's the fruit of a conflict. Maybe more plausibly in my mind, it's the fruit of a good judgment about I don't really want to put a shaky witness on the stand. So, but when we have that under AEDPA, we don't get to go, it's not de novo review. We don't get to go back and make our own call about that. So, I understand, but it almost seems as if, Your Honor, Judge Notto, as if you're sort of conflating the Strickland analysis with the Kyler v. Sullivan analysis. We're looking to see if there's been a division of loyalties that impermissibly favored one person's interests over the defendant's. We see that here because what we know from the record from Garcia's declaration is that trial counsel told her, don't come to court to testify because doing so is going to put you in legal jeopardy. So, what did trial counsel do? Can I add, but he also said, she also said in her declaration that trial counsel told her that her testimony would not help Conrad. So, there are two things. Correct. And those two things, one could read the declaration to mean that it was the trial counsel's belief that those interests would be aligned because A, she wouldn't be helpful to him because she was such a bad witness and might actually put the nail in the coffin if she testified and B, it wouldn't be helpful to her. So, on the face of the declaration, it suggests that there was an alignment of interests as well, doesn't it? Well, it suggests that there were two alternative reasons, I think, and I'll get to that in a second because I'd like to finish my thought from earlier, which is this, is that trial counsel, one of the reasons why he told her not to testify was to protect her liberty interests. And by doing that and by telling her not to testify, he was able to protect them, but at great cost to Conrad for the reasons I explained because he needed her to come to court to testify. You're pointing out that, Your Honor, that, you know, there's multiple reasons that trial counsel may have advised her not to testify. Maybe she would have been a bad witness, but also her legal jeopardy was that interest. We don't have to demonstrate that the conflict, that the division of loyalties was the only cause, even the primary cause. That's a rule that Respondent has invited this court to apply in this case and they don't cite any case for that proposition. It seems, I'm sorry to interrupt just really quickly, it seems as if you're telling us that we should take at face value one of the things that are in her declaration, but then look at with a jaundiced eye the other thing because what the declaration actually said was it would not help Conrad. I think you can take at face value both things in the declaration and still agree with our position because Lockhart v. Terhune says that we don't have to show the primary reason, we just have to show that the conflict seems to have influenced trial counsel's behavior and the conduct in the case. And you're pointing out that there's, you know, two different sort of analysis here, when we're in Strickland land versus when we're in Sullivan land. And here you're saying that there's the actual conflict and the actual conflict is this liberty interest, is that what you're saying? That is correct. And so if they don't, if those interests don't align, then there's an actual conflict and we can presume the prejudice, correct? Exactly. I see that I'm starting to run into my rebuttal time, but the analysis would flow very naturally and very cleanly from that point. If this court agrees with us that there is an actual conflict because their interests diverge, then we presume prejudice. And the standard that the California Court of Appeal applied in this case is the same standard that it has applied in two other cases. And in both of those cases, that was Jones v. Johnson and I'll remember the other case in a minute. Oh, I think it was Lockhart v. Terhune. So those two cases analyze the same standard that's at play here. In fact, the standard that was at play in Jones v. Johnson is almost identical to the language that the California Court of Appeal found used in Conrad's appeal. And this court found that standard was contrary to clearly established federal law because the California Court of Appeal was grafting an actual prejudice standard, i.e. the Strickland prejudice standard, onto the Kyler v. Sullivan standard, which is supposed to be a presumption of prejudice. As this court explained in Jones v. Johnson, that is a, quote, amalgamation of two different standards that's contrary to clearly established federal law. So I would like to reserve the remainder of my time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court, Deputy Attorney General Susan Kimba, respondent. I'd like to initially respond to your comments that were made earlier and point out that by the victim, Garcia, not testifying live at trial, but instead having her preliminary hearing testimony read at trial, Petitioner's Defense Counsel, Chad Calabria, actually got the best of both worlds in the sense that the substance of her testimony was admitted at trial, in which she took the blame for everything. She denied the petitioner did anything wrong to her, did not beat her, did not burn her with an she said that all the drugs and the guns belonged to her, while at the same time, since it was read into the record, she was not cross-examined at trial and shown to, and possibly shown to be a very bad witness for the defense. I do want to note that at the preliminary hearing. Counsel, that might be a great strategy for the defense. Show her to be a liar at the trial, or show her to be a great witness. Either way, the defense benefits from that, because they're going to say, well, was she lying now? Or was she lying then? Or she's going to say, oh yeah, believe her, because she's saying all the things that we want her to say. But there's, tell me the downside of not putting her on, because they already had the statements, right? The government had the statements, so they were going to come in, right? So what was the downside? Things were awful already. Things were, you know, they established that she was not a great witness. What was the benefit? I'm sorry to interrupt, just to clarify, but would the preliminary hearing statements have come in? Because if she's an available witness, they wouldn't have been read in, would they? Well, if she were available, if they were inconsistent with her preliminary hearing, then they would come in as an inconsistent statement. We wouldn't know that if she had testified. The parties agreed, I thought, to read the preliminary hearing. Yes, because what happened... There was no dispute about a disability. There was a due diligence hearing, which showed that the DA attempted to locate Garcia for trial, but wasn't able to locate her. But my only point was, it was read in because she was an unavailable witness. Yes, that is correct. But so whether, if she were there to testify, I suppose it might come in anyway. Depending on how her testimony went, if it was inconsistent with her prior statements at the preliminary hearing, then they probably would have... Okay, so my apologies, please. You can answer Judge Mendoza's further questions. But I just, but that goes to focus that, well, in the bigger picture, in this case, Petitioner is trying to characterize his two claims, both regarding Garcia and the second one regarding his attorney's personal legal problems, as falling under the Sullivan standard, when they do not. They both apply under the Strickland standard. And the reason for both, why they don't fall under Sullivan, is that the Sullivan standard applies with concurrent representation regarding co-defendants. This does not involve that factual situation. In the first claim, we have Garcia... Hold on. I thought that Ms. Garcia was represented by the... Calabria. Donald Calabria, which was the father... Of trial counsel. Right. So in the same firm. That is correct, Your Honor. And where trial counsel provided legal advice to the victim, correct? Told her, hey, if you come, you could be prosecuted. That's legal advice, counsel, isn't it? It is legal advice, but the source of that only comes from the Declaration of Garcia, which was presented in July of 2015, way after the trial in 2013. In the record, it shows that Donald Calabria's... He was retained for Garcia, but his representation, if you can in the record, that Chad Calabria was... Do you agree that he was representing her? Donald Calabria, I would say that he was retained in the declarations from both Donald Calabria and Ms. Garcia. It says that he was retained to stand by her in case she was recalled to be a witness. Retained is the key word, counsel. He was retained, correct? Yes. So he was the attorney? For her, yes. In the same firm where trial counsel was? Yes, they were from the same law firm. And the trial counsel provided legal advice. According to Garcia's declaration, that is, he told her, I don't think that you should come to court because it's not good for Ronnie, referring to Petitioner, and you may face consequences if you lie to the police. That's what her declaration indicated. Isn't that a direct conflict? It is not. If we're going under the Sullivan Standard... Yes. And Petitioner needs to show that there was an actual conflict that adversely affected his actual conflict, there has to be a trial attorney who was actively representing conflicting interests. And as both your honors had discussed a little bit earlier, in this case, it's very different because both the interests of Petitioner and Garcia were aligned and not divergent after the night of December 28, which was the date of the crimes. Well, hold on, counsel. Wasn't it the case that, according to counsel, and you know the facts probably better than the rest of us, but she was potentially a suspect as well, so she was possibly facing trial or charges, but the government chose not to charge her. Instead, she was a witness for them. But aside from that, if she showed up in trial and perhaps perjured herself, that was not going to be great for her. How is that not a direct conflict with him wanting her present? Well, it was not that particular aspect of her declaration as far as being told you could face consequences if you come to court. That was not good for her. However, it's important to note there were two things that were said that Garcia noted in her declaration. One, trial counsel said it won't be good for Petitioner if you come to court, and two, you, Garcia, could face consequences if you come to court. Do we need to take those two things at face value? So this is my question that I asked opposing counsel. Though both of those things are said, do we necessarily have to read some sort of alignment of interest based on the fact that they were both in the declaration? Well, it's important to note that this was only found in her declaration, and a declaration is a declaration. It's not, although she did, you know, say it under penalty of perjury, she also said many other things actually at trial that one could interpret as not being consistent with her So in order to determine what actually was the conflict, if there was an actual conflict, then why wouldn't we remand for an evidentiary hearing on this point? Well, a couple reasons. Under the record that we have, I don't believe that there was an actual conflict because the interests were not divergent. They were aligned between Garcia and Petitioner. And second, hypothetically, well, and also under Penholster, we would have, we discussed this under the record that was before the state courts at that time. And third, unfortunately, Chad Let me, if I may ask you this, what if Mr. Calabria, I guess I'm going to say Calabria, that's how we would say it at home, but with Mr. Calabria, let's say he had a little bit of both. Okay, let's say he wanted to make sure that Ms. Garcia didn't get in harm's way by potentially lying on the stand or otherwise exposing herself. And also, it was a bad deal in his We don't have to have an either or. Like, it could have been a blend. Probably may have been. Yes, yes. Even if it's a blend, that's still not grounds for overturning or granting the petition, is it? No, and the reason for that is because let's assume that both were true to some extent, and the trial counsel, Chad Calabria, thought that both were true. Then in this case, Petitioner has failed to show adverse effect on his trial counsel as a result under the Sullivan test. We're those two reasons were true, Petitioner has failed to show that that representation, you know, led to the adverse effect on trial counsel Chad Calabria. Just to jump in, I'm sorry, but that's because there was one legitimate non-conflict of interest reason for making that call. And even if there had been a concomitant conflict reason, it doesn't really matter, right? That is correct, Your Honor. And I just do want to emphasize that we don't know how she would have testified at trial, but based on the fact that at the preliminary hearing, I do want to note that she got a new tattoo of Petitioner's first and last name on her face and neck. That alone would have been something for the jury to observe live at trial, and she had very, she really had no explanation. Well, counsel, going back to what Judge Dono just said, when you have a defense attorney whose interest is to defend their client, is also representing the victim who's accusing, presumably, the defendant, you're saying that there's no inherent conflict of interest there, actual conflict of interest. Well, I would say, turning to the facts of this case, that there was no conflict because she did everything after the time of the date of the crimes, and except for one meeting at the DA's office in January of 2013, every single thing she did and said was to try to help Petitioner's defense. She repeatedly asked the DA's office to drop the charges. Everything she did after was trying to help his defense. Isn't that the purpose of having even Sullivan in the first place and not going into the Strickland type of analysis, where we have to look at this active, actual conflict? And here, it's always going to be hard to know, because I think Judge Dono makes a great point. You know, there might be some interests that might align, but how do you know that when you're representing both parties? I think generally that may be the case, but in this case, the record shows that the interests were not divergent. And it's a very different case from the typical situation where the victim does everything, everything she does or testifies is against the defendant's interest. In this case, the bulk of what she did, especially preliminary hearing testimony by Garcia, was to help Petitioner's defense. And this is, you know, this is a domestic violence situation where those things happen more so in those type of cases. Let me ask this. Is your best argument for the record shows that their interests were aligned, the things that she was doing to support Mr. Conrad? Or is it rather that we can read into Mr. Calabria's trial strategy, if you might call it that, to say that, you know, which carries more weight in terms of your argument that the record here shows that their interests were aligned? I think the latter, in the sense that in... Trial counsel strategy saying both... You're not a good witness. Not a good witness, and you could be exposed to prosecution. And the you're not a good witness is actually supported by the record of the FAPS in this case. And if we are in Sullivan land and we're looking at trying to determine if there's an actual conflict, to what extent do we import the Strickland analysis of reasonable attorney representation except for, you know, the extreme edges of what lawyers do? Well, in Sullivan, the standard is very specific about showing actual conflict that adversely affected your trial attorney's performance. And that's the test. Well, I think Sullivan says you presume prejudice. In other words... You do presume prejudice. If you establish an actual conflict, which is different from Strickland, you presume prejudice. That is correct, Your Honor. I think that's an important difference. There is a presumption of prejudice. However, the test includes the adverse effect on counsel as part of the whole actual conflict analysis. Although prejudice is presumed, petitioner still has to show that there was an actual conflict, meaning attorney had conflicted actively... Was representing... Actively represented conflicting interests that adversely affected trial counsel's performance. Well, this is what I'm wrestling with. Let's say there was a little actual conflict and a little non-actual conflict. So, you see what I'm saying? Yes, Your Honor. To me, this is just me talking. Mr. Calabria could have been serving two masters, so to speak. And I'm not sure that that... It's a conflict when you're serving one at the expense of another. But here he may be serving two. And I haven't seen any case that sort of squarely addresses that. And that's what I was trying to get your thoughts on. Well, I too have not seen a case specifically on point. But that also goes back to my more general point that the Sullivan Standard and based on the three Supreme Court cases that apply here. We've got Sullivan, we've got Mickens, and we've got Holloway. And those cases, just... It's important to note the facts in those cases. In Sullivan itself, it involved two defense attorneys representing three defendants at several trials. In Holloway, it was one defense attorney representing three co-defendants at the same trial. So this is the kind of actual conflict the Sullivan test is referring to. When people cite Sullivan, those are the facts behind Sullivan and Holloway. And Mickens, it's important to note, was really a case about successive representation. In Mickens, the Supreme Court left open the question of whether successive representation is under the Sullivan Standard. In Mickens, the facts were that the defense attorney had initially represented the murder victim. And then after the defendant murdered the victim, he was appointed to represent the defendant. So that was... And there was a very short period of time in between that, but that was a successive representation situation. And the Supreme Court didn't expand Sullivan to say, oh, this successive representation falls under Sullivan. They did not do that. But doesn't that suggest that... Doesn't Mickens suggest that Sullivan isn't confined to just existing co-defendants at one point in time? You know, I mean, to Judge Mendoza's point, if Ms. Garcia was... If there was a possibility that she could have been prosecuted by the district attorney's office, then she would have been a co-defendant. So, you know, and it's not squarely in... It's not a successive representation issue, but it's not purely a co-defendant. But Mickens suggests to me that we shouldn't be so constrained in viewing the Sullivan presumption. I do want to point out first that Garcia was not charged as a co-defendant. So she is not a co-defendant in this case. And second, Mickens did have some language in there saying that it's not... It does not want... It does not seemingly approve of the expansion of Sullivan to other situations, such as an attorney's personal or financial matters, and that went through a list of other things that would not really be the concurrent representation situation of Sullivan. They didn't include this situation regarding the exact facts here. And my position is that this does not fall under Sullivan because she is not a co-defendant. And so this is outside of the Sullivan standard, and that's why the Strickland analysis applies to both the first claim regarding Garcia as well as to the second claim regarding his trial counsel's personal legal matters. So, and I do want to just touch upon the Strickland analysis just for a moment. It's really important to note that Petitioner cannot succeed on the Strickland analysis under both claims. And that's the reason why he's trying to fit this under the Sullivan standard. Under the Strickland standard, he has to show Strickland prejudice, and he absolutely cannot. There was overwhelming evidence of Petitioner's guilt in this case. And in the record, in my briefing, I've summarized it, but I do want to point out a couple things. He beat her in the motel room for three to six hours with all sorts of objects that were in the motel room, and one of the objects in the motel room was an iron, like a clothing iron. He heated it up, he waited for it to heat up, and then he burned her legs and arms repeatedly, at least 10 times, with the iron. And she sustained injuries all over her body from the beating as well as from the burning. And the burning iron left behind very, very unique iron marks on her skin. If you think of the tip of an iron, which is a little bit pointed but also a little circular, these are the type of marks that were found on her body. So, there's really no other reasonable explanation for how she sustained these unique burn injuries. And for that reason, as well as the other huge amount of evidence of his guilt, he cannot prevail under the Strickland analysis. Let me ask you one last question. Yes, Your Honor. Just to work off of Judge Sinatra's point, if there's a possibility of a little bit of actual conflict and a little bit of not. Under Sullivan, if there's some actual conflict, isn't that it? Do we get to splice it a little bit that way? Because then it seems like we are importing Strickland a little bit. If we do believe that there's a splice of actual conflict and a little bit of not, doesn't that mean that we should presume actual prejudice in that case? I do not believe that is the case. I believe that because there was a non-conflict reason, meaning Garcia would have been more likely a very unfavorable trial witness live, that that reason was... It's a separate and independent basis for the decision is what you're saying, maybe? I believe that that is. I guess, even if there was an actual conflict, if it did not lead to deficient representation of the claim or had an adverse effect. But counsel, how will you ever know that? How will you ever know that? You have, I'm sort of representing this person, but my interest also, I'm sort of representing this person, but I'm really more so on this side. I mean, how are you going to know that? And I do want to say that this comes only from Garcia's 2015 declaration, that this is what Chad Calabria supposedly told her. It's not, I don't think he should come to trial because, and these are the two reasons he gave. Again, the trial record does not have anything regarding this remotely, so that's what we're relying on. And if that's the declaration... Which goes to my original, or my latter question, which is, why don't we then send it back to get to that point? If that's what you're raising, if your point is, well, we don't know because it's in this declaration, send it back to the trial judge and figure out whether or not there was an actual conflict. Well, first, I do want to say that this should not be sent back to the trial court. And second, the reason in the declaration regarding her being a bad witness, that's enough. And lastly, I don't know if I mentioned this earlier, sadly, Chad Calabria is currently deceased. And so even... Mr. Calabria has died? He's deceased. He passed away around, I believe, 2014. I'm not sure. You're talking about the son, the main... Trial counsel, petitioner's actual trial counsel. His father was Donald Calabria. I think he's a New Mexico writer. I don't know the details. I only know from the record and at the new motion hearings later on, they do mention that he has passed away. And that's because what happened at the first new trial motion by the defense, he did testify briefly at that hearing. That was, I believe, 2014. And they had to continue it because he testified about some matters, but Chad Calabria decided not to testify about other matters regarding his legal issues. And then they had a second hearing regarding that defense, new trial motion, but by that time, he had passed away. So we've let you go over. Let me see if... I just don't have any more... Mr. Calabria was not... There were some allegations about not being alert at trial and so on. That never ripened in any kind of professional conduct issue, did it, to your knowledge? I don't know from the record. All I know that in the record, into the record was read some information that the new defense attorneys for... That he was asleep during trial. Well, this was based on another hearing for the new trial motion that was based on a deputy of bailiff's testimony. However, the bailiff ultimately testified that he doesn't know whether these are just his observations. And ultimately, trial court denied that motion as far as that ground. And more importantly, this is an uncertified issue that petitioner has... No, I understand, but he didn't go to state bar proceedings or get disbarred or anything. I do not know from the record. All that I do know is in the record, there was some information about Chad Calabria's legal problems that were read into the record by his new trial attorneys around sentencing and afterward. And they did say that a letter was sent to the state bar, and that's all I know. I don't know about any specifics regarding those proceedings. So... Any last questions? Unless, your honors, I just do want to emphasize that this case, the two claims fall under Strickland. He cannot show Strickland prejudice and do not fall under Sullivan. Thank you, your honors. Thank you. Mr. Weinstein, you have the last word. Thank you, your honors. I just have three points to make. The first, as to whether there's an actual conflict, I would encourage the court to take a look at Sanders v. Rattel, Lockhart v. Terhune, Lewis v. Mail. These are three cases where a lawyer had represented or was representing two people who were simultaneously implicated in the same crime. And this court, on all three occasions, found that there was an actual conflict. I think for many of the same reasons, Judge Mendoza, that you are picking up on, which is it's really difficult in that situation to discern what punches were pulled or not. That's probably why Lockhart only requires a petitioner to show, and I'll just read it, to show that the attorney's performance was adversely affected. A petitioner just has to show that it, quote, seems to have been influenced. In other words, quote, some effect on counsel's handling of aspects of the trial was likely because of the conflict. That's a pretty low standard for us. I don't really see how that helps you, because we know which punch was pulled. Ms. Garcia didn't testify. There's no mystery about that. This is not a situation where there are a thousand decisions and we can't tell how each one went. There's just one. Was she going to testify or not? And we know the answer. She didn't. So, we're not worried about what we can't see. We know exactly what happened. So, I don't think those cases really help you much. No. I think that they do help us, because what we see is counsel impermissibly favoring someone else's interests over the client's. To Judge Donato, you've been asking, you know, to what extent do we essentially look at trial counsel's alternative reasons? Sanders versus Rattel did that. It's unclear to me exactly how that fits into the analysis. But one of the things that the court concluded in Sanders is that the alternative strategy that counsel had pursued was not sound trial tactic. And I think that for the reasons I mentioned earlier, that it was not a sound trial tactic to have Garcia not show up to court to testify. And then, Mike? Can I ask for Sanders, did the court import the typical Strickland analysis as to what is unsound or reasonable trial tactics in the main? Yeah. I can't remember off the top of my head. I remember that the point that I gleaned from Sanders is that in looking at the alternative strategy, the court found that it was not a sound tactic, and that bolstered its analysis for finding a conflict. I see I'm out of time. If I could just make one last point. Judge Donato, you brought us some of the other facts. I think it's important to keep, you know, understand what this case is really about, is that you have a person who's now serving a life sentence, who was represented by a who is also representing the alleged victim, who could have been a co-defendant, who served as a state's main witness, who was facing prosecution in his own cases at the same time, and who a bailiff testified at a post-verdict hearing that he was under the influence of drugs and sleeping three to four times throughout the course of the trial. And it was a short trial. I don't say this lightly, Your Honors. Trial counsel's behavior in this case is outrageous. It's shameful. It's disgraceful. And as we explained in our briefs and emphasized today, it was unconstitutional. And for that reason, we would ask this court to vacate the district court's decision and remand with instructions for the court to grant the habeas grant. Thank you. Thank you very much, Your Honors. Thank you, counsel, for your arguments. They've been very helpful. The matter will stand submitted and court is adjourned. All rise. This court for this session stands adjourned.
judges: SANCHEZ, MENDOZA, Donato